UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL QUINAN,<br><br>        Plaintiff,<br><br>    v.<br><br>ADAM KLEINBERG, et al.,<br><br>        Defendants. | Case No. 21-cv-05295-JCS<br><br>**ORDER DENYING MOTION TO DISMISS, VACATING MOTION HEARING AND STRIKING DOCKET NOS. 26-1 AND 26-2 UNDER RULE 12(F) OF THE FEDERAL RULUES OF CIVIL PROCEDURE**<br><br>Re: Dkt. Nos. 26, 28 |

## I. INTRODUCTION

Plaintiff Russell Quinan asserts a securities fraud claim under Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5 ("Rule 10b-5 Claim"), as well as related state law claims, against Defendants Adam Kleinberg, Paul Giese and Theo Fanning. Presently before the Court is Defendants' Motion to Dismiss for Failure to State a Claim and Dismiss Supplemental Claims ("Motion"), which is brought by Kleinberg and Giese and in which Fanning joins. The Court finds that the Motion is suitable for determination without oral argument and therefore vacates the December 3, 2021 hearing pursuant to Civil Local Rule 7-1(b). The initial case management conference set for the same date shall remain on calendar. For the reasons stated below, the Motion is DENIED.[1]

## II. BACKGROUND

### A. The First Amended Complaint

Quinan alleges that in 2009, he acquired 50,000 shares in a company called "Traction," which is a California "S" Corporation based in San Francisco, California, by exercising options

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

that were issued to him when he was general manager of Traction. First Amended Complaint ("FAC") ¶¶ 11, 15. Defendants Adam Kleinberg and Paul Giese are Traction's Chief Executive Officer and Chief Technology Officer, respectively; Defendant Theo Fanning was one of the founding partners. *Id.* ¶¶ 12-14. At the time of the events that gave rise to Quinan's claims, all three owned 239,575 shares of Traction common stock and were Traction directors. *Id.*

Quinan alleges that Defendants engaged in a "multi-year campaign to deprive [him] of the benefits of his equity stake in Traction, and ultimately to 'purchase' his shares over Plaintiff's objection through a reverse share split that was structured to only impact Plaintiff." FAC ¶ 1. According to Quinan, after he acquired his stock shares Defendants began to engage in various forms of self-dealing that reduced the value of his shares. *Id.* ¶¶ 16-22. In particular, he alleges that they ceased to pay shareholder dividends and distributions but made "*disguised* distributions to themselves" by paying themselves salaries of $225,000, awarding themselves large bonuses for new business, paying for their "personal emoluments" such as a club membership, and paying themselves bonuses to cover tax liability. *Id.* ¶¶ 16-21 (emphasis in original). Quinan alleges that he was not afforded equal treatment, receiving no bonuses or distributions and – unlike Defendants – he covered his own tax liability of "approximately $76,308 in taxes on approximately $254,000 in income attributable to his Traction shares." *Id.* ¶ 22.

The specific events that gave rise to the alleged securities fraud occurred in 2020, when Defendants agreed to "get a Company valuation to aid Defendants in a buyout of Fanning or Giese's shares." *Id.* ¶ 23. Quinan alleges that Defendants commissioned "Stonebridge Advisory, Inc. to value Traction's enterprise value for 'partner buyout purposes'" but "did not provide Stonebridge with then-current financial information, to minimize Traction's valuation." *Id.* ¶ 24. The resulting valuation was "between $1.16 and $1.280 million, even though Traction's cash on hand and retained earnings were over $2.5 million at that time." *Id.* ¶ 25. Based on that valuation, Quinan's shares were worth between $75,000 and $82,000. *Id.*

Between April and July, 2020, "Defendants negotiated amongst themselves about how to buy out Defendant Fanning, and the price for such a buyout." *Id.* ¶ 26. Fanning challenged the Stonebridge valuation "because it did not take into consideration the fact that Fanning would no

1   longer be employed with a $225,000 per year salary once he was bought out, the fact that Traction
2   was going 'virtual' and would no longer be required to expend vast sums in annual lease
3   obligations, and that Traction had received $530,000 in forgivable Payment Protection Plan (PPP)
4   funds." *Id.* In May 2021, Fanning agreed to accept $500,000 for his shares if an "additional profit
5   kicker" were included for future profits. *Id.* Quinan alleges that "Defendants were stating in
6   private conversations related to the purchase of Fanning's shares, that the Company had a
7   valuation of at least $1.628 million." *Id.* ¶ 28.

8   According to Quinan, on May 31, 2020, Defendant Kleinberg emailed him "a copy of the
9   Stonebridge Valuation, asking to 'talk this week so we can work something out' to buy Plaintiff's
10  shares." *Id.* Kleinberg acknowledged the Stonebridge valuation, "but stated 'we feel a more
11  accurate value to base your shares on is $800k.' " *Id.* Quinan alleges this statement was
12  knowingly false and misleading in light of the concurrent negotiations with Fanning based on a
13  higher valuation of Traction's worth. *Id.* Similarly, he alleges that a statement Kleinberg made to
14  him on June 3, 2020 in a text message – "We are on the verge of bankruptcy, we have a million
15  dollar lease obligation" – was false and misleading because "Traction was not on the verge of
16  bankruptcy and the lease obligation was ending." *Id.* ¶ 29.

17  "By June 5, 2020, Defendants had tentatively agreed to a '$550k price all inclusive' for
18  Fanning's 30.7% interest in Traction, plus options in favor of Fanning, plus '30% of gross profit
19  as commission on new business.' " *Id.* ¶ 30 (citation omitted). "Between June 9 through June 29,
20  2020, Defendants continued to negotiate a price for Fanning's shares between $550,000 and
21  600,000, plus distributions to Fanning to cover tax payments, plus continued salary." *Id.* ¶ 31. Yet
22  on June 26, 2020, "Kleinberg emailed Plaintiff and stated that 'we deem the value of the
23  [C]ompany to be substantially less than [$1,280,000] due to the current year's financial
24  performance to date and the current economic climate[.]' " *Id.* (citation omitted). Kleinberg "
25  'offered to repurchase [Quinan's] shares in Traction for $60,000,' which was 'valid for seven
26  days.' " *Id.* According to Quinan, this offer "represented an enterprise valuation for Traction of
27  approximately $934,000." *Id.* These statements were "knowingly false and misleading when
28  made" because in the same time period "Defendants were negotiating a price for Fanning's shares

3

between $550,000 and 600,000, which represented an enterprise valuation between approximately $1.791 million and $1.954 million, approximately double what was being represented to Plaintiff." *Id.* Quinan emailed Kleinberg and refused the offer on June 26, 2020. *Id.* ¶ 32.

Quinan alleges that once he refused the offer to purchase his shares, Defendants "decided to purchase Quinan's shares by shareholder action directed solely at Quinan." *Id.* On June 29, 2020, a letter was sent to Traction shareholders that there would be a shareholder meeting on July 10, 2020 ("the July 10 meeting") to address a "proposed amendment of the Articles of Incorporation 'for the purpose of effecting a Reverse Stock Split of 1:75,000, with all fractional shares to be liquidated…' " *Id.* ¶ 33. Meanwhile, on July 1, 2020, Defendants Kleinberg and Giese reached an agreement to buy 10,000 shares owned by the only other Traction shareholder, Isabel Jagoe, for $18,000, which "represented an enterprise valuation of approximately $1.406 million." *Id.* ¶ 34. Traction also "concluded its negotiations to terminate leases on its two office spaces 'by the end of July', which, according to Defendant Kleinberg in an email to Traction employees, 'freed [Traction] from the huge burden of having to pay a ridiculous amount of money for … office space.' " *Id.* ¶ 35. And "as of July 3, 2020, Defendants had a draft agreement to purchase Defendant Fanning's 30.7% interest in Traction for $550,000[,]" which "represented an enterprise valuation of approximately $1.791 million for Traction." *Id.* ¶ 36.

At the July 10, 2020 shareholder meeting, Defendants and Isabel Jagoe all voted their shares in support of the reverse stock split. *Id.* ¶ 37. The minutes from the meeting stated that the stock split was necessary in order for Traction to "remain a going concern." *Id.* The minutes stated that although the Stonebridge valuation was for approximately $1.2M, since the date of the valuation there had been a retained earnings reduction of $257,000 and Director Theo Fanning had announced his departure; therefore, the current valuation of Traction was calculated at only $792,000. *Id.* These statements were false and misleading when made, Quinan alleges, because "(1) Defendants did not subjectively believe the 'value' of the Company to be $792,000 as reflected in the buy outs of Fanning and Jagoe; (2) Defendants did not disclose or discuss the prices Kleinberg and Giese were contemporaneously paying for Fanning and Jagoe's shares; (3) Defendants acknowledged that retained earnings represented a 'dollar for dollar' measure of value

4

for Company shares, but did not disclose that it still had over $2 million in retained earnings; (4) Defendants did not disclose or discuss the fact that the Company no longer had its lease obligations or obligations for Fanning's salary, or received PPP funds; and (5) Defendants knew that the Reverse Stock Split was not necessary for Traction to 'remain a going concern', but was instead a subterfuge to acquire Plaintiff's shares at a discount after Plaintiff refused to sell." *Id.*

Defendant Giese emailed Quinan on July 14, 2020, informing him that "the Shareholders approved the reverse stock split" and that "[t]his transaction shall occur on July 20, 2020 based on an evaluation of $792,000." *Id.* ¶ 40. On July 18, 2020, Giese sent another email to Quinan stating that "company management has determined that a reverse stock split is necessary to maintain the company as a going concern." *Id.* ¶ 41. "On July 21, 2020, Kleinberg emailed Plaintiff stating that the minutes from the July 10 meeting show 'how we calculated the revised valuation of the company, which we deem to be a fair market assessment of our current circumstances.' " *Id.* ¶ 41. Two days later, Kleinberg sent Quinan another email explaining the decision that had been made at the July 10 meeting to carry out the reverse split. *Id.* ¶ 43. Quinan sent an email to Kleinberg the same day challenging the decision and Kleinberg responded on July 28, 2020 again justifying the decision. *Id.* ¶¶ 44-45.

Quinan alleges that "[o]n August 6, 2020, Traction issued [him] Check Number 0045530507 in the amount of $50,850 noting '50,000 shares @ $1.017/shr = $50,850.' " *Id.* ¶ 54. He further alleges that "Traction has consistently and unambiguously asserted that Plaintiff is no longer a shareholder of Traction, even though Plaintiff did not cash the check." *Id.*

### B.   The Motion

In the Motion, Defendants argue that Quinan does not have standing to assert his Rule 10b-5 Claim because he is not a bona fide purchaser or seller of shares who based his purchase or sale on alleged fraudulent activity. Motion at 4 (citing *Shivers v. Amerco*, 670 F.2d 826, 829 (9th Cir. 1982); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38 (1975)). Therefore, Defendants ask the Court to dismiss the Rule 10b-5 Claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. They further assert that because this is the only federal claim and there is no other basis for federal jurisdiction, the Court should decline to exercise supplemental

1  jurisdiction over the remaining claims under 28 U.S.C. § 1367 and therefore, that those claims
2  should be dismissed without prejudice. *Id.* at 4.[2]

3  Quinan rejects Defendants' argument, asserting that he has alleged standing under the forced seller doctrine, "which provides a cause of action to shareholders who, *without any say*, find themselves *fraudulently forced-out of their securities*." Opposition at 1-2 (quoting *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1499 (9th Cir. 1995) (emphasis added in Opposition); *Shivers v. Amerco*, 670 F.2d 826, 830 (9th Cir. 1982) (discussing "forced seller" doctrine and citing *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970 (1967))). Because his Rule 10b-5 Claim is sufficiently alleged, Quinan argues, the Court also should not dismiss his state law claims under 28 U.S.C. § 1367. *Id.* at 11. He agrees, however, that if the Rule 10b-5 Claim is dismissed his state law claims should not proceed in federal court. *Id.* at 12.

12  In their Reply, Defendants argue that the forced seller doctrine does not apply because Quinan "had plenty of opportunity to make decisions regarding his investment and was therefore outside of the bounds [of the] forced-seller exception." Reply at 4. For example, they contend, Quinan could have agreed to sell his shares for a more favorable price when Kleinberg extended an offer on Traction's behalf to purchase them and thus averted the reverse stock split. *Id.* Or he could have attended the July 10 shareholder meeting but he chose not to do so, Defendants assert. *Id.*

### III. ANALYSIS

#### A. Legal Standards Under Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. "The purpose of a motion to dismiss

---

[2] In the Motion, Defendants supply a lengthy background section based on facts set forth in declarations by Defendants Giese and Kleinberg filed in support of the Motion. *See* dkt. 26-1 & 26-2. Defendants offer no explanation for offering evidence in support of a Rule 12(b)(6) motion instead of relying on the allegations in the operative complaint and the Court finds no basis for relying on these declarations, which are stricken under Rule 12(f) of the Federal Rules of Civil Procedure on the basis that they are "immaterial." *See Holcomb v. Internal Revenue Serv.*, No. 19CV1482-LAB, 2019 WL 5086566, at *1 (S.D. Cal. Oct. 10, 2019), aff'd sub nom. *Holcomb v. United States Internal Revenue Serv.*, No. 19-56208, 2020 WL 1873315 (9th Cir. Feb. 27, 2020) ("Under Fed. R. Civ. P. 12(f)(1), the Court may sua sponte strike from a pleading 'any redundant, immaterial, impertinent, or scandalous matter.' ").

under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Rather, the claim must be " 'plausible on its face,' " meaning that the plaintiff must plead sufficient factual allegations to "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B. Whether Quinan Has Adequately Alleged Standing to Assert a Rule 10b-5 Claim

"Section 10(b) of the Securities Exchange Act makes it unlawful '(t)o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance' in contravention of SEC rules." *Shivers v. Amerco*, 670 F.2d 826, 828 (9th Cir.

7

1982). Under Rule 10b-5, which is promulgated under Section 10(b), "only a purchaser or seller of securities may bring a suit for damages." *Id.* (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.) cert. denied, 343 U.S. 956 (1952)). Thus, "[t]he purchaser-seller rule excludes both 'shareholders . . . who allege that they decided not to sell their shares because of . . . a failure to disclose unfavorable material (and) . . . shareholders . . . who suffered loss in the value of their investment due to corporate or insider activities . . . which violate Rule 10b-5." *Id.* (citing *Blue Chip*, 421 U.S. at 737-38).

Courts have found an exception to the purchaser-seller requirement, however, where a shareholder plaintiff was forced "as a matter of law to sell" their shares and where the alleged deception and the actions of the corporate defendants were "all part of a single fraudulent scheme." *Id.* (citing *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970 (1967)); *see also Jacobson v. AEG Cap. Corp.*, 50 F.3d 1493, 1498 (9th Cir. 1995) ("The forced sale doctrine provides a cause of action under the securities laws to plaintiffs who are forced to convert their shares for money or other consideration, or forced to fundamentally change the nature of plaintiffs investments as the result of a fraudulent scheme."). For example, in *Vine*, the plaintiff was forced to sell his shares when the defendants acquired stock by means of deception and then used their majority holding to institute a short-form merger, "freezing out" the plaintiff shareholder, who was forced to exchange his stock for cash. 374 F.2d at 635. In that case, the court explained that under this limited exception to the purchaser-seller requirement, "reliance by plaintiff on the claimed deception need not be shown" to establish a violation of Rule 10b-5 because "the complaint alleges that plaintiff, in effect, has been forced to divest himself of his stock and this is what defendants conspired to do." *Id.* On the other hand, in *Shivers*, the court found that the forced seller doctrine did not apply where a reverse stock split led to a decline in the value of the plaintiffs' shares and they subsequently decided to sell their shares. 670 F.2d at 830. The court reasoned that the plaintiffs "were not forced to sell their stock" because "[t]hey could have held the stock in hopes that it would increase in value." *Id.*

The facts alleged here are similar to those in *Vine*. In particular, Quinan alleges that Defendants, who held a majority of Traction shares, voted to carry out a reverse split of 1:75,000,

1  with all fractional shares to be liquidated.  Because Quinan owned only 50,000 shares, this action
2  meant that he could not continue to hold his shares, which were liquidated.  In other words, he was
3  forced to sell his shares, in contrast to the plaintiffs in *Shivers* who could have held on to their
4  shares even though the reverse stock split led to a diminution of their value.  Further, as discussed
5  above, the FAC alleges that Defendants repeatedly justified the reverse split on the basis of a
6  valuation that they knew to be inaccurate, using much higher estimates of Traction's value to
7  negotiate the purchase of the Fanning and Jagoe's shares.  Drawing all reasonable inferences in
8  Quinan's favor, he has alleged that he was forced, as a matter of law, to sell his Traction shares as
9  a result of Defendants' fraudulent scheme.

10  Defendants' argument that the forced seller doctrine does not apply because Quinan "had
11  plenty of opportunity to make decisions regarding his investment" is unpersuasive.  Defendants
12  cite no authority that suggests that because Quinan declined a previous offer by Traction to
13  purchase his shares, the subsequent liquidation of his shares resulting from the reverse stock split
14  somehow became volitional.  Similarly, Defendants' argument that the sale was not forced
15  because Quinan did not attend the July 10 meeting where the action was taken is unpersuasive.
16  Defendants' argument is based on the premise that Quinan could have prevented the action despite
17  his position as a minority shareholder.  Yet on a Rule 12(b)(6) motion the Court must draw all
18  reasonable inferences in Quinan's favor and it is an entirely reasonable inference that his
19  attendance at that meeting would not have changed the outcome.  This argument fails for the
20  additional reason that there is no allegation in the FAC addressing whether or not Quinan attended
21  the July 10 board meeting.   Finally, the Court rejects Defendants' argument that there could have
22  been no forced sale because Quinan did not cash the check that was sent to him when the shares
23  were liquidated.  Whether or not he cashed the check, Quinan alleges that Traction shareholders
24  approved a reverse stock split that liquidated all fractional shares and that Traction has
25  "consistently and unambiguously asserted that Plaintiff is no longer a shareholder of Traction."
26  FAC ¶¶ 44-45.  Nothing in the case law suggests that these allegations are not sufficient to
27  establish a forced sale.

28  Therefore, the Court concludes that Quinan has adequately alleged standing to bring his

Rule 10b-5 Claim. Because Defendants' challenge to that claim fails, the Court need not reach their further argument that the Court should decline to exercise supplemental jurisdiction over Quinan's state law claims.

## IV.  CONCLUSION

For the reasons stated above, the Motion is DENIED.

**IT IS SO ORDERED.**

Dated:  November 26, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge